The cat on the table does a nice shimmery meticulous gesture which raises the cat.   Next case is Eugene, Eugene A., and ALZ Belgium, Ocelot Stainless versus the United States and Allegheny Ludlam et al. 05-1550, Ms. Ackerman. Good morning, your honors. We are here on the denial of a preliminary injunction by Judge Aquilino, to which all parties consented. That denial should be reversed. Although the issues may appear complicated in this case, on the merits, the case in fact presents a simple issue. Whether commerce may instruct customs to misapply the law and impose anti-dumping duties on goods that are not subject to an anti-dumping order. Under the clear statutory law, the answer to that question is no. The anti-dumping order in this case applies only to stainless steel plate in coils from Belgium. It does not apply to merchandise from Germany. There is no question that the merchandise at issue was German, because that was the place of its last substantial transformation, namely hot rolling. But your client kept on saying the opposite. And it was the result of a mistake of law, your honor. But the law was clear at the time. Mistake of law or fact? It was a question of law that was a mistake of law that was made by the importer. And it should have originally been classified as German. And if it had been, we would not be standing here today. But it was not until the fourth administrative review. Mistake was not caught until then. And as soon as the mistake was recognized, Arcelor went right both to Customs and Commerce to notify the agencies of the mistake. But as Judge Lurie pointed out, is that a mistake of fact or a mistake of law? It was a mistake of law. There's no dispute about the facts here, your honor. Although the defendants attempt to manufacture If there's no mistake of fact, if there's no dispute as to the fact, it was the fact that was stated wrongly. So why isn't it a question of fact rather than a mistake of law? Well, it's what mistake was made. It was a mistake. It wasn't a mistake as to what the facts were out there in the world about where it was hot rolled. It was a mistake as to the characterization of the product. But you're right, it was a mistake. It's actually a mixed question. It was a mistake of fact that was made about whether this was Germany, German, or Belgium. And that was a mistake of fact. If it's Tuesday, it's Belgium, but this time it was German. Yes. So but in any event, it was a mistake. Aren't you bound by that error? Well, that is why we are here. That we believe the custom statutes and regulations clearly give us the right to correct the error. And this court's opinion in Xerox supports that. But your position here, I guess most modestly put, is that you think you are entitled to a chance to make that argument on the merits. And that if you don't get an injunction here, you're afraid, if I read between the lines here, that the CIT will not read Chenier or Xerox broadly enough to save you from foreclosure of that argument. Is that? Yes, that is correct. And Judge Aquilino found that we could not establish, he could not say we established irreparable harm because we might have a remedy. But that's not enough. To preserve our rights, we need to know whether and how we can challenge, or to ensure that we can challenge commerce's instructions to customs to treat this merchandise as Belgium, even though it is German. We need a judicial remedy, a right to judicial review of that question. And that's our point. But doesn't Chenier give you that right? We believe it's not clear. Chenier has been distinguished in the lower courts as a case where, I think there's a recent Yukon case. Yukon, the Judge Rustani's, Chief Judge Rustani's, right? Yes. That that was limited to its facts, and the party did everything there to protect its rights. It went firmly in Dana's petition. All we're doing is trying to preserve our rights. So you would seem to be in the favored position under Chief Judge Rustani's view, having done everything you could to preserve your rights. But it seems like an odd structure, going to the Mukon case, to say that in order to bring yourselves within Chenier, and for all later parties to bring themselves within Chenier, you have to go through this song and dance of seeking an injunction, perhaps even appealing to this court, from an injunction that A, you're not going to get, and B, you don't really care if you don't get it, as long as you make your record of having preserved your rights adequately, to then trigger Chenier, as Chief Judge Rustani sees it. That's odd. We're agnostic as to the right way to challenge Congress's instructions here. It could be through Chenier, and an injunction may not be needed. But unless this court clearly holds that we will have a right to challenge Congress's injunction and not lose any rights, then we believe a P.I. is warranted. But without a P.I., you might still have those same rights under Chenier. You might, when they're saying you could, but you might. But we need to, the thing is that we don't know. But the record below, at least, would be preserved. Assuming that those rights were not only preserved to some extent under Chenier, but were congruent with the rights you would have in a pre-liquidation setting. I mean, I take it that you're, well, maybe this isn't an additional concern. Maybe there's no chance that there would be a difference in the extent to which you would be protected, whether it be standard of review or what. But you want the same rights under Chenier that you would have, as you see it, in a pre-liquidation setting that is available to you only if you get a P.I. That's correct, that's correct. But moving to the merits. We believe the custom statutes are clear that importers have the right to correct errors through the time of final liquidation. In particular, custom statutes regulation 173.1 provides, and specifically, and it's very important, so I wanted to read the regulation, that port directors have broad responsibility and authority to review transactions to ensure that the rate and amount of duty assessed on imported merchandise is correct and that the transaction is otherwise in accordance with the law. This authority extends to errors on the construction of a law and to errors adverse to the government as well as the importer. And once customs regulation 173.2 goes on to allow the correction of these mistakes and the authority to correct mistakes under 173.1 at the time of protest, through the protest procedure. And the protest procedure that's outlined in 19 U.S.C. 1514, Congress has provided in 1515 to allow refunds. It specifically provides refunds if duties have been found to be incorrectly assessed or collected. And Xerox, we say, confirms our right to go through the protest procedure. Had not commerce intervened with its instructions, specific instructions to customs to treat this merchandise in the first three review periods as Belgium, even though it is German, we would have been going through the protest procedure. But isn't that an important distinction for purposes of the applicability of Xerox? I mean, it seems to me, and correct me if my general take on these cases is not right or not in accordance with your understanding of them, but I read Xerox to say, if customs makes a mistake in the interpretation of the instructions given by commerce to take that set of cases, then that's something that can be preceded by protest and conventional system of going through as was presented in Xerox, that Xerox said was available. But if customs is just doing indisputably what commerce is telling them to do, then it seems to me much less clear that Xerox applies. And then you're into some form of Xinyai, maybe. But the question here is, in Xinyai, the problem was there seemed to be a disconnect between the instructions that were given by commerce and the determination that was made. This is a little different, because here the determination and the instructions look pretty much alike. So you're going one step further back, it seems to me, than Xinyai in saying, well, it's really the determination that's a problem. No, actually, it's interesting. What you're talking about goes to the irreparable harm issue about the proper. Well, that's what's really concerning. There's two sort of parallel issues here. One is, what is the proper way to preserve our rights, to challenge commerce's instructions? But the question on the merits as to whether we have a right to correct our country of origin designations to customs, that's a separate question. We say commerce's instructions are wrong, should be set aside. We should be able, through the protest procedure, to correct the mistake. And that's where Xerox also comes into play. And that's where I was using Xerox. And in Xerox, there was a mistake made by the importer. And it was allowed to correct that mistake through the protest procedure. And that's how- In terms of process, you don't really, well, I don't want to put you in a position you have to concede something that you'll end up regretting. But it would seem to me, at least, prime officiate, tough to fit this case under Xerox. So the question then is- In terms of jurisdiction, in terms of- Yes, setting aside the merits, talking entirely about whether you're gonna be foreclosed and therefore have irreparable harm to your rights to defend yourself on the merits. Then we're into Xenia. And the question then, in my mind, is, I mean, you can, concede is the wrong word. You seem to take the position in the reply brief that if we were to give you a gold-plated, get out of jail free card saying Xenia, all you have to do is present this card and you get one free trip under the auspices of Xenia, you'd go away. This case, you wouldn't care about the lack of an injunction. We would go away, but we would litigate the- Sure, but I mean, you go away from this appeal because this appeal is entirely on whether you get an injunction. Yes. So your concern is Xenia might be read, whether the way Judge Rustani read it, somewhat narrowly, or whether it might be read to say, yes, with respect to a disparity between the instructions and the determination, but no, with respect to the right to go through 1581I mandamus proceeding with respect to a problem with the original determination. Isn't that the crux of the problem with Xenia? Yes, and it's unclear. And that's all we want to do is be able to preserve our rights, whether it's under Xenia or by getting an injunction. And I don't think Xenia addressed, there was no injunction requested there. Here, all we're doing is requesting one to preserve our rights. The injunction is only to preserve the status quo. Now, you have the fourth administrative review going forward, so you're covered for the first time, but you're asking for the retroactive ability to correct the administrative reviews for the one, two, and three. Well, in our view, it's not retroactive that this merchandise was always German. We're just correcting an error. There are many, many things that need to be filled out in customs entries form regarding to the valuation, the quantity, the country of origin, the type of product, the classification, many things that could be errors made with respect to and are. Are you saying this was just a clerical error? This is, and it's interesting, this was similar to a clerical error because it's not clear how well, how, whether there was an actual construction of the law by the importer or he just didn't think about it. It was an error, and so it shouldn't have been made, and there are other errors made in valuation, in quantity, that importers are routinely allowed to correct up until the time of final liquidation. There is a time limit. You can't do it forever. It's until the time of final liquidation, until the protest period expires, and Congress has given the protest period, it used to be 90 days, it's now 180 days, to protest and correct errors, both mistakes of fact and mistake of law, so we believe it doesn't make a difference whether this was mistake of law or fact. Zuckerman, you are well into your rebuttal time, which you can use or save. Thank you. Okay. Mr. Panzera for the government. And you're gonna take 10 minutes and save five for Mr. Gordon. That's correct, Your Honor. May it please the court. This court should affirm the Court of International Trade's denial of a preliminary injunction because the court properly exercised its inherent authority to independently assess the likelihood of success upon the merits, notwithstanding the concern of the parties. Let's go, if we could, because time is limited, directly to the irreparable harm issue. Let's assume that we don't find a sufficient basis in the likelihood of success issue to decide this case without getting to the question of irreparable harm. Your brief is somewhat equivocal, I guess is a fair word, on the applicability of Xinyi and the jurisdictional aspects of Xinyi to the facts of a case like this one. Can you help us any more in terms of the specificity of the government's position with respect to what Xinyi means and does it apply to a case like this one? Well, the appellants did not argue that Xinyi does or does not apply. And the court did not reach that issue. Well, the court talked about Xerox and the court gave a somewhat equivocal assessment of Xerox as well. But I am sure that the Department of Justice has discussed this issue in the course of preparing for this argument, because it seems so central to the question of irreparable harm. Would you like to share with us your position on that? I just wanted to give some context to why this issue came up, because the court below did in fact give the appellants the benefit of the doubt that whatever harms that they may be experiencing, their complaint was deficient on its face and that they had failed to establish a likelihood of success that would warrant a preliminary injunction. So it did give them the benefit of the doubt. And they concede that there is doubt as to the interpretation of Xinyi as to whether Zenith would in fact control and make their case accountable. It's a $4 question with respect to harm. And so the government didn't take a position with respect to Xinyi because it wasn't before the court and it's not before this court, whether in fact Xinyi would in fact indicate that there would be jurisdiction even if those entries were liquidated. And the reason why that is because- It seems to me that if we set aside likelihood of success and we focus on irreparable harm, isn't it very much before this court? Because otherwise the question, if Xinyi applies, then as they say in their reply brief, they're happy. They will go back and argue the merits. If Xinyi does not apply, then it seems to me they're out of luck because once these liquidations occur, they're dead. This court needs to determine whether the lower court properly balanced the factors. Let's focus in on irreparable harm. I really want to just hear what you have to say on irreparable harm. And Xinyi in particular. The issue would be if this court does reach the issue of irreparable harm and does determine that it is appropriate for this court to conclusively determine whether there would be jurisdiction under Xinyi, that question is impossible to answer at this juncture because it turns on equity. I mean, the question in Xinyi was whether, the facts of Xinyi were that there were original instructions that failed to include a particular company in the order. And so there were cleanup instructions that included that particular company, but it directed liquidation at a rate that was other than that had been ordered by the court. And because there was this issue of knowledge, how could that importer or that company have known that the instructions would not have reflected the court's order, then the court found that Xinyi did not sleep on its rights. And so because there were equitable concerns, the court found that reliquidation was proper. In this case, the court would have to find that in fact, the appellant did not sleep on its rights. And here they're conceding that they in fact did not bring the mistake to the attention of the agency until the fourth administrative review. So even if Xinyi were to apply, the question is, well, is equitable reliquidation warranted? And of course, we don't think that the court needs to reach that determination, but if it did, they would have to make that shown, that would still be available. And we don't believe that it would be available. And that was one of the reasons why we consented. Doesn't this get back to the merits? Aren't we back to the merits? It seems to me we've circled back around without. Because it's central to the lower court's determination. I understand, but I'm really trying to, I'm really trying to segregate out the question of the merits from the question of whether you could simply say conclusively in a case in which what you're challenging is a determination that was made in a previous administrative determination and reiterated with respect to products that were entered under those previous determinations, you're barred unless you get to court before the liquidation of those entries. Now, does Xinyi say, no, you're not necessarily barred? Necessarily barred. It's unclear as to whether Xinyi would apply to this case. What's your position on the fact that? I want to know, I guess, to the extent that you're in a position to say, what the government would say if we send this case back, or suppose that we simply say, no, we think it's very possible that Xinyi may apply, but we're not sure, but we're going to deny the request for a preliminary injunction. If this goes back and they argue Xinyi, is the government going to say, no, no, Xinyi doesn't apply here? Well, we're certainly not waiving any arguments that we might make later. And the reason for that is because our position at this time is that it's unclear whether it would apply or not. The court didn't base its decision on Xinyi, and they certainly didn't argue that Xinyi would or would not apply. So it puts the government in a difficult position to have to speculate as to whether in a future action that jurisdiction would be proper, especially where the court didn't even reach that issue at this time. So the court, so the Justice Department certainly considers Xinyi to be a gloss on Zenith, and to the extent that there's some sort of friction between those two cases, we certainly take that into consideration when we determine whether to consent to an injunction. In this case, within the matter of days that we had to even look at the case after the injunction request was made for our consent, we determined that the most advisable course was to give consent based on Zenith and the uncertainties in Xinyi, and that the court would benefit from a fuller briefing on the merits, even though we considered that the case was deficient on its face and had no chance of succeeding on the merits. And the court saw through the deficiencies of the complaint and based its decision on likelihood of success. Now, is that an argument for us to send it back? Only to the extent that this court finds that it was an abuse of discretion for this court, for the lower court, to independently assess the likelihood of success on the merits and make a determination that, in fact, that there was no likelihood of success on the merits sufficient to warrant an injunction. And there's no case law that would support the proposition that appellants are making that it's an abuse of discretion not to defer to the consent of the parties merely because the government has agreed to an injunction. What does that consent of the government mean then at that point, when you did consent to the preliminary injunction to the PI? The consent only means that the government will stay its hand and will not issue the liquidation instructions to customs to take any action. Well, holding the status quo. So you had agreed to hold the status quo at that point. That's correct, and in our consent, we specifically reserve the right to argue that the case is meritless on its face. No, I understand the reservation, but it was at least holding the status quo so that many of the legal issues on the merits could have been tried at that point. Well, the point of that was because we felt that it was in the court's interest to have full briefing on the issue. We could have argued and disputed a preliminary injunction, and in fact, the United States does on occasion dispute injunctions where we find that a complaint is facially defective. In this case, because of the administrative record, and we're dealing with four administrative records, we felt that the court might not understand the full issues, and in fact, the court did understand the issues, saw right through the complaint and found the deficiencies, and it is not an abuse of discretion for the court to assess likelihood of success on those grants. Is the government taking the position that the party did in fact waive its rights under the first three administrative procedures? Did we take the position that they waived their rights to challenge the importation from Germany rather than Belgium? In the memo that Commerce had issued with respect to this issue that was raised as to whether there should be retroactive applications of this kind of a merger. That's that July 1, 2005 memo. The Commerce specifically indicated that the principles of administrative finality precluded them from going back to the previous review periods and applying the country of origin determination to closed review periods, and the Commerce specifically indicated that under Torrington, which relied on Timken, that the principles of administrative finality precluded such a retroactive application, so yes. So the waiver would be there because of that. They sat on their rights. If they had information available to them that would have warranted a legal determination with respect to substantial transformation that would have warranted a separate country of origin determination, then they could have made that request and they would have borne the burden of establishing a separate country of origin determination in the previous reviews, but they did not do so. So- Mr. Panzeri, you're well into Mr. Gordon's time. Oh, I apologize. Between the two of you. Go ahead. For those reasons, we request that the court affirm the lower court's denial of a preliminary judgment. Thank you. We'll give Mr. Gordon a full five minutes. Good morning, Your Honors. I do want to interrupt Mr. Panzeri, I think he's done a fine job this morning. There was no way you should have interrupted him. You take a different position with respect to Shinyai. We do, Your Honor, yes. You don't have as much difficulty, I think, as he should say, I don't think it's a question of difficulty, but you think it's clear that Shinyai applies in a setting such as this? We think it is much more clear, yes. Let me preface my comments by saying that it's interesting here because the actions of Arcelor by bringing a protest suggests that they themselves believe that they are subject to Xerox, which wouldn't be Shinyai land, I think it would be Xerox land. But that being said, we don't necessarily think that that is the case based on what Xerox itself stands for and that more rightly, their remedy would be one that comes and that arises under the theory of Shinyai. That's the way it struck me too. I mean, Xerox seems to me limited to a case in which customs makes the mistake, right? Customs didn't make a mistake here. That's correct. In Xerox, customs made a mistake in interpreting the liquidation instructions and how they applied to a certain kind of a rubber-coated belt, whether it was a machine belt or a platen belt on a coffee machine. Here, the instructions are very clear and customs will be in the role of simply carrying out commerce's clear instructions arising from that fourth and only the fourth administrative review and applying to the fourth administrative review and forward, the review in which the issue is joined. Chief Judge Rustani in the Murcan case, I guess is the name of it, isn't it? Yeah, Mucan, seemed to be concerned and perhaps legitimately so that Xinyai opens up a huge number of potential cases and she seemed to be looking for a way to cabin it with the, you must take aggressive measures to protect your rights pre-liquidation and failing that, then you can come in under Xinyai. What's your view as to that? You're familiar with the case. Yes, the Mucan case does add a layer of analysis or discussion. Do you think she's right? I don't know that I would be prepared to stand here in court today and tell you that Judge Rustani is wrong. With that being said, I think there will certainly be instances where the facts of the case and the actions of the party to protect their rights are very, very important, exactly as they are in this case. Here we have a party that failed to assert its rights through three separate, not only three separate administrative reviews, but not even in the original investigation as to the country of origin issue, only bringing it during this fourth administrative review proceeding. And Congress, consistent with its well-settled law, decided that the determination made on country of origin would apply to that review and going forward. The records of the other reviews are closed. They've been settled and in none of those reviews or even the original investigation was country of origin ever raised or addressed. Everyone, and certainly the Belgians, reported their entries as Belgian and accepted them as such. But Judge Rustani and Mukon really limited to someone sleeping on their rights in that particular case, because they did not bring in administrative reviews for one particular period. So she actually talks about sleeping on their rights at that point. The part, the plaintiff in that case failed, did not bring one review, and another review, it participated, but submitted a questionnaire response late. I mean, his actions weren't as diligent as they could have been, certainly. I do think that the record- That's not really the case here, is it? Well, I- It's not similar. This case has some similarities, but I think that the record is not developed enough to prejudge or to indicate or suggest the outcome that would be reached by the lower court judge. Here, the Belgians clearly failed to assert their rights throughout the very clear, well-known administrative procedures and processes that they were involved in heavily, from the original investigation to the first review, the second review period, and the third review, where their review wasn't held, but they requested one, and then withdrew their review request. So, I mean, they have been availing themselves of their rights, but never once actually bringing this legal issue before the Department of Commerce, which is where the substantive analysis, which is an analysis of law applied to the facts of the record, of the fourth review record, was made. None of the prior reviews. But they did raise this in the connection with the fourth review, right? Exactly. And it resulted in an instruction which pertained expressly to the other materials, entries from the other three reviews. That's, I think, A65, paragraph five, right? That just says, not just anything that's covered by the order, but expressly states that if it's hot-rolled in Germany and not further cold-rolled in Belgium, you're stuck, right? So, for the entries arising in the fourth review, and the- No, in the prior, pre-fourth review. I mean, in other words, the adverse outcome is gonna continue to apply to exactly the same goods that get a more favorable treatment under the fourth review. But that adverse result will continue to apply to the first entries that have not yet been liquidated from the first three reviews. As far as their entries being treated the way they certified them, that's exactly correct. And then that is consistent with Congress's law, but more importantly, more fundamentally, it's consistent with the fact that those records, the records of those reviews were complete, certified by the respondent, the issue was never joined. There's no record in those reviews to show that those entries in the prior three reviews in the original investigation are anything but the way the Belgians certified them to be, which is country of origin, Belgium. And their attempts at customs, to address country of origin for customs purposes, are fundamentally different as a matter of law than country of origin determinations made by the Department of Commerce in its anti-dumping duty proceedings. Now, you'd like them to be consistent, and they usually are. There may be instances where they are not. And here, their attempts to revisit substantive determinations they themselves made by certifying their entries as being Belgian at the Department of Commerce during dumping proceedings, attempting to revisit that at customs is wrong. So your position, I guess, correct me if this is a wrong statement of your position, but is that yes, they may well have an opportunity to challenge the application of the anti-dumping duties to anything that has not yet been liquidated. Setting aside Chinyai for now, under the Timken case, even if it goes back to prior administrative determinations, but they can't do it in this case because they are responsible for the error and they haven't preserved their opportunities to correct that error during those other administrative determination proceedings. Yes, they prevailed on the issue in the 4-3G. They won. And all those entries from the 4-3 period and going forward where they're hot-rolled in Germany, a coil plate that is poured in Belgium, hot-rolled in Germany, returned to Belgium, potentially for the processing before it shipped out to the United States. For those entries from the 4-3 period going forward, that country of origin determination, the substantial transformation determination does pertain. But to the prior reviews where the records were gathered, certified, set, and formed the basis for the anti-dumping duty calculations that arose there, those records are set. And clear and prudent reasons of finality do apply. But again, to make sure I understand the distinction here, you're not suggesting that they can't litigate as long as the entries from the first three have not yet been liquidated. They can't litigate the question of whether they ought to pay the higher anti-dumping duty. But rather you're suggesting that as a matter of administrative finality, they're going to lose when they do litigate those questions. Isn't that? Yeah, I think that is correct. I will give them, I will say they may bring their, they can have their day in court. And in fact, we are having our day in court right now down at the CIT. The rest of this case is not really being very active right now, but it's there. It's an active case. And they haven't chosen to prosecute their case there, notwithstanding how vehemently they seem to want to move this forward. But they may bring it. We feel that it's very, very likely that on the merits they will not prevail. That is consistent with what the judge below found, which allowed him to reach his determination as to that one prong of the preliminary injunction analysis. And then combined with that, I think he realized that their confusion as to where, what theory to advance as far as irreparable harm cannot be construed. Confusion cannot be construed as giving rise to the requisite showing to satisfy the irreparable harm problem. Well, but if you are at risk of losing your rights to litigate a particular issue, if relief, an injunction is not granted, that seems to me to make a... Assuming your fears are not totally baseless, that seems to me to make the kind of showing of potential harm that courts pay attention to. I mean, what I find so difficult to get my hands around in this case is Judge Aquilino says, well, I think you've got a pretty good chance, maybe, who knows, probably of winning, getting jurisdiction under Xerox. So you don't really have a good inequitable, irreparable harm argument. And the government says, well, maybe you've got a right under Shinye, although we're not waiving our rights to tell you that you don't and slamming the door on you when we get back. But there's no irreparable harm. And to me, irreparable harm, you tell me if this is, I'm barking up the wrong tree here, but irreparable harm seems to me to be, we have no confidence and we've done the work and we've looked at this, we have no confidence that we're not just gonna be foreclosed from getting to the merits if we don't get this injunction. That's the kind of thing that usually makes a pretty good showing of irreparable harm, don't you think? Yes, but there are four elements that need to be balanced here. That's one of the four elements in the analysis. And the way you look at this case, no matter how you slice it, I think they appear to be, have some apparent jurisdictional basis somewhere. Either they're going to have the ability to protest under Xerox, which we don't necessarily agree with, which would give rise to the ability to appeal protests that are denied. Or if that's not the case, we think it is, they may have the ability, they would have to find eye jurisdiction under Chenier, but there may be other issues attendant to the Chenier type analysis that have to be developed below. Thank you, Mr. Gordon. Your time is certainly up. Ms. Ackerman will give you your four or five minutes. Thank you. Well, just to quickly go over the irreparable harm point, we just would like to reiterate that Arcelor merely needs to preserve its rights to challenge commerce's instructions, either through a preliminary injunction or a decision that Arcelor will have a right to challenge its commerce instructions on the merits absent of preliminary injunction, that is that Chenier applies. But on, and I think we've discussed that pretty well in depth, but on the merits, I want to emphasize that the merchandise at issue in the first three review periods has not been liquidated. In fact, 35% of it, of the entries at issue, has not even been subject, it has not been liquidated at all, it's not been subject to a notice of liquidation. 65% of it has been subject to a notice of liquidation, but we filed timely protests with respect to that liquidation. And under Xerox, and this is on the merits and not the jurisdictional irreparable harm issue, but on the merits, Xerox confirms an importer's right to correct errors. It was the importer's mistake in that case, it had mistakenly noted or referenced the dumping order on its entry and paid estimated duties. And then the merchandise was liquidated, the administrative review period was closed in that case. And this court held that it could correct that mistake because it was just a mis, it was just an application of the order. It could correct the mistake. And- That was the agency's mistake? No, no, it was the importer's mistake, just like here. In Xerox? Yes, yeah. What about the customs who made the mistake in Xerox? Customs just follow the, you know, follow the importer's mistake. In fact, I've got the briefs in Xerox and went through them and it's clear from the briefs. And because it was a misapplication of the order and it's customs duty to apply the order in accordance with law at final liquidation. And that's what the court held. It was clear in that case that the goods were not subject to the order. It's clear in this case. We are not trying to retroactively apply anything or reopen anything. We are not trying to reopen anything in the first three review periods. The country of origin of these entries was not decided. It was not raised, it was not decided. It did not have to be raised in those entries. Nothing in the statute requires that. In fact, the statutes give us the statute. I mean, we believe Congress is trying to rewrite the statutes here and take away our right to correct errors in our entry forms up to the time of final liquidation. So the final liquidation has not been done. What was the 35% that you were mentioning before? That is of goods that have not even been liquidated. There's an initial liquidation under the customs regulations. There was a notice of liquidation is sent out and then there is a chance to protest. Has that been issued? And for 35%, for 65%, 65%, a notice has been issued, but for 35%, it hasn't. 35% covered by which? The administrative review, the fourth administrative review? No, we're talking, I'm just talking about the entries in the first three review periods, because there's no dispute about the entries for fourth review on, that those will be liquidated as German. As German. What about the 65%? There's no notice of liquidation has been issued yet. None of those have been finally liquidated. So you would not be in harm if those notices were not sent out by commerce department? Oh, by customs? Yes, it was. The notice is what starts the period, right? Yes, but we believe we still have a right to challenge and correct our errors with respect to the liquidated entries that are pending protests right now. They have not been finally liquidated. And that was the case in Xerox. Let me make sure I understand. When the erroneous designation, or what you said was an erroneous designation of Belgian origin was made, that was made during the administrative review proceedings in each of the three? No. No. It was made in the entries, the customs entries that are filed with customs when the goods are entered into the United States. It's required by customs regulation that every import designates a country of origin. That's when it was made. But there was no representation made anywhere in the course of the administrative review? Not with respect to the particular entries. In fact, there was only an administrative review in one of the three periods. Right, that's true. There were two, but one was based on adverse facts. And there was a high rate that was determined based on adverse facts. It wasn't based on any of our data at all. And all we're saying is that our entries, our misdesignation of entries didn't affect that rate at all. It couldn't have affected that rate. And it didn't affect the rate, there was no review in the third period at all. So there was no rate determined there. So we were not even a chance to raise this issue. There was no administrative review. There was only one administrative review in the second period. And we did submit sales data. And it was, and the sales data was of sales, not necessarily of sales of merchandise that entered during the period under review, because that's the way commerce bases its rate on sales data and not entries. But so there was certified that there were some, that the sales were of Belgian merchandise. Right, okay. And that was an error. But, and that was something, it may or may not have affected the rate. And that is, but in any event, that fact does not take away our clear right under the custom statutes to correct this error and exclude this merchandise, which should never have been subject to duties under the order, which, and there is no dispute about that, that this is German. Now, are you saying that only during the second administrative review was the Belgian merchandise identified? I thought it was identified for all three administrative reviews. The third one was dropped. There wasn't an administrative, there was really only a full administrative review in one period, in the second period, even though that's not clear from the briefs. The briefs try to make it seem as if there was an administrative review in every period. There wasn't. In the third review, there wasn't a countervailing duty or an anti-dumping duty review at all. So how could we have certified anything in that review? We didn't. But the request was withdrawn, right? The third one. Yeah, but we did not certify the sales or entries in that review. And in any event, the point of administrative review, even when there is one, is that it determines the rate. It does not necessarily determine the country of origin of specific entries. Under Xerox, this court held that customs can make determinations, factual determinations, about the type of product and whether it is subject to the order. But the country of origin is identified by the import. And it is identified in each one of the reviews or just the first one. But it was identified as Belgian at that point. Identified in each import, importation. The imports, the sales data in the review, that was held. It was the sales of merchandise during the review period. Yes, it was identified. But that wasn't necessarily what the entries were in that period. That was all. Thank you, Ms. Ackerman. The case will be taken under advisement.